# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| SCOTT A. FELKER, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 13 CV 50298 |
| ) | Magistrate Judge Iain D. Johnston |
| CAROLYN COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Scott A. Felker brings this action under 42 U.S.C. § 405(g), seeking reversal of the decision denying him social security benefits. As explained below, the decision is affirmed.

## BACKGROUND

Born in 1963, plaintiff graduated from high school and then got a degree in electronics repair. In 1987, he joined the Navy where he served until 1990 when he was honorably discharged after being injured by being thrown off an aircraft carrier, an injury for which he received 30% disability compensation from the Veterans Administration. R. 87, 188, 306. From 1993 until August 2008, he worked as a sheet metal worker. R. 289.

On June 20, 2009, plaintiff was psychiatrically hospitalized at Linden Oaks Hospital. Ex. 8F. Plaintiff went to the hospital "at his wife's suggestion as his marriage was in the process of dissolution." R. 523. Specifically, three days before, he got into a fight with his wife causing her to obtain a restraining order. R. 551. At the intake interview, plaintiff explained that he lost his job recently and was working a night shift as a cab driver and had insomnia. He also told counselors that his stepfather beat him when he was a child and that he was having flashbacks. *Id.* Plaintiff was diagnosed with major depressive disorder and post traumatic stress disorder

("PTSD") and given antidepressants and engaged in outpatient therapy, all of which helped "very much." R. 552, 1037. Over the next few years, he periodically saw a psychiatrist, Jennifer S. Mellin, at the Hines V.A. Hospital.

On May 7, 2010, plaintiff filed his application for disability benefits. In December 2010, a psychologist consultative examiner, Dr. Mark B. Langgut, interviewed plaintiff and issued a report, finding his thought processes "were characterized by average coherence and normal speed, flexibility, and suggestibility." R. 525. Dr. Langgut listed PTSD as a "diagnostic consideration," but did not include any other diagnoses. On June 14, 2011, a sleep study was performed, and plaintiff was diagnosed with moderate obstructive sleep apnea. Ex. 10F at 3.

On September 6, 2011, the first of two hearings was held before the administrative law judge ("ALJ"). Dr. Ashok Jilhewar testified as a medical expert. He reviewed various medical records and opined that plaintiff did not meet any listings and that his residual functional capacity ("RFC") was similar to that found by the DDS medical consultants—namely, "sedentary capacity with some additional limitations." R. 79. He did not consider any psychological impairments, although he did discuss plaintiff's sleep problems, noting that plaintiff was diagnosed with moderate sleep apnea after the sleep study and was prescribed a CPAP sleep machine. R. 74-75, 85.

Plaintiff testified next. Much of the questioning focused on his job as a taxi driver. Here is the key part of the testimony:

> Q. When and where was the last time you worked?
>
> A. Well, I drove a cab a couple days a week for a friend of mine, I've been doing that up until the – last week I did it a couple of days.
>
> Q. Well, how many hours, when you do work driving a cab, how many hours a day do you work?

    A.  Well, I'm on 24 hour call, but it's like, in a small town and it's like, you know, you only get, like three or four calls during that 24 hours. So I just keep it at the house and –

    Q.  There's an entry in one of the records from the [] Hines Hospital. [] I believe it's Kim [Gillespie], but I'm not certain. [I]t says that you had a hard time this past week, Mother's Day 2011. You had been working almost around the clock with the cab company because the other employee had a heart attack and you had picked up his shift.

    A.  Yeah, that weekend, yeah, because he had a heart attack and they – and they asked me to – well, the thing is, you're not actually – like I said, it's a small town and so – a small farm town and [] you don't really get a lot of business. It's just that I have to stay up and make myself available.

* * *

    Q.  [W]hen you do a fare, how far do you drive?

    A.  It's usually right – just right in town [] – most of the business, what I do is late at night bar closing.  That's basically it.

R. 88-91.

    Plaintiff testified that he takes several medications, three for breathing, a mood stabilizer in the morning for depression, two pills twice a day for a chronic cough, and four pills at night to help him sleep. R. 94-95. Since he has been on medication, he has been a "better person" and "able to cope." R. 102. Plaintiff testified that his PTSD did not result from his Navy injury but from his childhood when his stepfather "used to beat [him] up all the time, like, getting drunk and then just had fun, you know." R. 95.

    Plaintiff testified that his depression medication "wipes [him] out." R. 101.  When asked whether it made him drowsy, plaintiff responded: "Yeah, because it says on there that – because I know, like, with the cab and that, I shouldn't be doing that because it says that it'll make you drowsy and that's one of the side effects and you shouldn't be, probably, driving or anything on it[.]" *Id.* Plaintiff then stated that he sometimes has to "drink lots and lots of coffee" to stay

awake. *Id.* His attorney asked whether this was during the day. Plaintiff: "if I'm doing stuff or if I'm on call for the cab, yeah. I got to keep myself wired[.]" *Id.* He testified that he takes a nap almost every day and then sleeps about four hours at night. Plaintiff wears his sleep mask (elsewhere referred to as a CPAP machine) every night. R. 106.

After the hearing, Dr. Kelly Renzi performed a consultative examination and issued a report. She noted that plaintiff's mood appeared depressed, his memory and concentration were below average, and he was pleasant and cooperative. She diagnosed him with moderate major depressive disorder and assessed his GAF at 60. She did not diagnose him with PTSD. R. 901.

Based on this report, a second hearing was held, before the same ALJ, on May 8, 2012. Dr. Michael Cremerius, a psychologist, testified first. He summarized the medical evidence and concluded that plaintiff did not meet a Section 12 mental health listing. R. 42. Dr. Cremerius agreed with the DDS reviewers that because plaintiff had some irritability and anger issues, he would work best "in socially undemanding, restricted settings." R. 44.

Plaintiff also testified at the second hearing. The taxicab job was again at issue:

Q. Are you currently working at all?

A. [I] [d]rive a taxi three days a week, and when I drive it I drive it for 24 hours each time.

Q. So you're on call for 24 hours?

A. Yes, sir.

Q. And out of those 24 hours that you're on call, how many hours are you actually operating a vehicle would you say?

A. It's just hard to say. Some days we hardly get any. It's just a small town. And other days, like on a Saturday night, a lot of people from the bars will get real busy and actually spend half the – probably, eight hours just constantly in the cab.

R. 54-55.

On May 30, 2012, the ALJ issued his opinion. At step one, he questioned whether plaintiff's job as a taxi driver constituted gainful and substantial employment, which if true would doom his claim. However, the ALJ decided to "reserve this issue" and proceed with the other four steps because he had no way to verify plaintiff's income given that it was unreported. At step two, the ALJ found that plaintiff had severe impairments of compression deformity of the T11 vertebrae; degenerative joint disease of the right hip; asthma; sleep apnea; mild leg length discrepancy; a depressive disorder; anxiety; and PTSD. At step three, the ALJ concluded that plaintiff did not meet the four paragraph B criteria for a mental health listings. In his RFC finding, the ALJ imposed physical restrictions and then limited plaintiff "to performing simple, routine and repetitive tasks" and noted that he "can tolerate only occasional interaction with co-workers, supervisors and the public." The ALJ found that plaintiff had "credibility concerns" based on the following: "He is currently working and earning income as a tax[i]-driver, but testified that he does not report this income. The claimant has also alleged that he has significant problems walking and sitting, but reported and testified that he could operate a riding lawnmower and mow 3/4 of an acre of property, drive a car for 8 continuous hours, and walk for 2-3 miles with his wife several times per week." R. 28. At step five, the ALJ found that plaintiff could not work full-time as a taxi driver, given the above RFC, but that he could work as an address clerk, account clerk, sorter, bench assembler, and inspector. R. 29.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a

reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). And, as the Seventh Circuit has repeatedly held, the federal courts cannot build the logical bridge on behalf of the ALJ. *See Jensen v. Colvin*, 2013 U.S. Dist. LEXIS 135452, *33-34 (N.D. Ill. 2013).

Plaintiff raises three arguments. The first two attack the ALJ's RFC finding and focus mostly on plaintiff's sleep problems. The third is based on new evidence (summarized below).

**I.      Failure To Include Limitations For Sleep Apnea and PTSD.**

Plaintiff argues that the ALJ failed to account for his sleep apnea and PTSD in the RFC determination. According to plaintiff, these impairments caused "significant sleep dysfunction," which plaintiff describes in this laundry-list of symptoms: "insomnia, nightmares, irritability,

waking up screaming and crying, daily mood disturbance, and having poor sleep." Dkt. #17 at 8. In addition, plaintiff states that he has to take a four-hour nap every afternoon. *Id.*[1]

This Court is not persuaded by this argument. Plaintiff's main contention is that the ALJ was internally inconsistent in finding that plaintiff's sleep apnea and PTSD were severe impairments at step two, but then failing to include an explicit limitation directly correlated to them at step four. As an initial point, this Court is not aware of any requirement that the ALJ must include an explicit limitation directly correlated to each impairment. The step two determination is merely a "threshold requirement." *Castile v. Astrue*, 617 F.3d 923, 926-27 (7th Cir. 2010). And, as the government points out, the Seventh Circuit "has not yet decided whether an ALJ's findings at step four must be consistent with those at step two[.]" *Guranovich v. Astrue*, 465 Fed. Appx. 541, 543 (7th Cir. 2012); *Stellhorn v. Colvin*, 2014 WL 7156630, *5 (S.D. Ill. Dec. 15, 2014) (finding that any inconsistency was a harmless error).

Here, the mere fact that the ALJ found PTSD and sleep apnea were severe impairments at step two provides little insight as to what the ALJ ultimately thought about their effect on plaintiff's ability to work. At step two, the ALJ provided no analysis, leaving the detailed discussion for later in the opinion. Thus, the ALJ may have simply been giving plaintiff the benefit of the doubt at step two, similar to the way the ALJ skipped over the question of whether plaintiff was gainfully and substantially employed.[2] In fact, the evidence was mixed as to whether plaintiff's sleep apnea and PTSD were severe. Dr. Renzi found that there was not enough evidence to show that plaintiff had PTSD. Dr. Cremerius stated that "there's not a lot of support for" the PTSD diagnosis and, if plaintiff had PTSD, it was not substantially limiting

---

[1] In addition to sleep apnea and PTSD, plaintiff cites his depression medication as being a third cause for these problems.
[2] The ALJ also did not include explicit limitations in the RFC for other impairments such as plaintiff's mild leg length discrepancy.

because it was based on events that happened "some time ago" and he had "very adequate functioning since that time."[3] R. 50-52. To the extent that the ALJ's opinion is internally inconsistent—and this Court does not find it is—the most reasonable resolution would be to find that plaintiff's impairments were not severe at step two.

Aside from the above assertion, plaintiff relies on only his own testimony (and that of his wife) that he was suffering from the laundry-list of symptoms quoted above. This argument, however, overlooks several important findings made by the ALJ and entirely ignores the medical evidence in the record.

First, the ALJ found that plaintiff's testimony was not fully credible. The ALJ noted that plaintiff failed to report his income from taxi driving and that, although he claimed significant problems walking and sitting, he was able to "drive a car for 8 continuous hours" and walk "for 2-3 miles with his wife several times per week." R. 28. Plaintiff does not challenge this finding.

Second, the ALJ included several limitations in the RFC directed toward at least some of these symptoms. The ALJ found that plaintiff was limited to routine and simple tasks and was to have only occasional interaction with others. The government argues that these limitations compensate for "any lack of alertness" due to sleep apnea. Dr. Cremerius and Dr. Brister both testified that limiting plaintiff's contact with other people would address plaintiff's irritability and anger resulting from his alleged PTSD. Plaintiff does not acknowledge the fact that these limitations were included.

Third, the ALJ's RFC finding was supported by the assessments of multiple doctors and medical reports. The ALJ relied on two testifying medical experts (Drs. Jilhewar and Cremerius), two examining psychologists (Drs. Langgut and Renzi), and one non-examining State agency

---

[3] Plaintiff served in the Navy for three years and worked for 15 years without any known problems from PTSD.

consultant (Dr. Brister). These doctors were aware of the allegations of plaintiff's PTSD, his sleep apnea, and his other impairments, yet offered opinions consistent with the RFC formulation adopted by the ALJ. For example, the ALJ noted that Dr. Langgut "diagnosed [plaintiff] with PTSD, but offered no functional restrictions." R. 27. Dr. Jilhewar in his testimony summarized the findings of the June 2011 sleep study and thus was clearly aware of these facts when he offered his proposed RFC finding. R. 74-75. Other than plaintiff's criticisms directed at the testimony of Dr. Cremerius, discussed below, plaintiff does not raise any arguments attacking the statements made by these doctors.

Fourth, and most significant, the ALJ put much emphasis on the fact that plaintiff had been and was continuing to work as a taxi driver. This fact provided evidence not only of plaintiff's general ability to work, but also partially explained his sleep problems, particularly the daytime napping. Here is the paragraph where the ALJ discussed sleep problems:

> A sleep study did reveal the claimant suffers from moderate obstructive sleep apnea, and the claimant was prescribed a CPAP machine (10F, p. 3). Despite this condition, plaintiff reported and testified that he "works around the clock" and is on call 24 hours per day as a taxi driver, which has interfered with his sleep (10F, p. 13, Testimony). He reported sleeping a "whole lot better" prior to his increased work activity as a taxi driver (Id.). The claimant has also engaged in activities including fishing and walking his dog in spite of his medical impairments (Id.)

R. 26. The ALJ referred numerous other times in the opinion to the taxi driving and noted that plaintiff testified that he was able on some days to "continuously" drive a cab for eight hours. *See* R. 27 ("he works as a taxi-driver, often driving continuously for over 8 hours"); *see also* R. 23, 23-24, 24, 28. At the two hearings, the ALJ asked many questions about this job. In sum, this issue was obviously central to the ALJ's decision.

Based on the above references, the ALJ clearly believed that plaintiff's daytime napping was explained by his night-time driving. The ALJ's reasoning is not unreasonable and is based

largely on plaintiff's own statements. At the time of the second hearing, plaintiff testified that he was working 24-hour on-call shifts three days a week. Even on days when the work was sparse and sporadic and he was not driving continuously, plaintiff still had to "stay up and make myself available." He testified that "most" of his work was "late at night bar closing," sometimes at 3 a.m. In the above paragraph, the ALJ specifically referred to an instance where plaintiff told a healthcare worker that he "worked around the clock" and slept better before he started driving a cab. All this is evidence shows that *plaintiff* attributed his sleep problems in large part to this job.[4] The ALJ also noted that plaintiff testified that some days he was "eight hours just constantly in the cab." R. 55. He was thus able to work a complete 8-hour shift without having to nap. In light of these facts, this Court cannot say that the ALJ was unreasonable in concluding that plaintiff, if he were no longer driving a cab at odd and late-night hours and if he were working a less demanding job, could work five days a week.[5] This is the type of judgment call the ALJ is authorized to make. The Court is not authorized to simply re-weigh the evidence because plaintiff does not agree with the ALJ's judgment.

---

[4] Although the ALJ only cited to one instance in which plaintiff told a healthcare provider about his sleep problems, the record numerous other such statements. *See* R. 551 (June 2009: "[Plaintiff] admits to insomnia, says he has not slept for the past four days. He reports that he works night shift as a cab driver since his job changed, and that has exacerbated his sleep problems."); R. 918 (Sept. 2011: "He is in the process of applying for disability; has been diagnosed with sleep apnea; still driving the taxi cab with his brother which further disrupts his sleep cycle"); R. 930 (March 2012: "I'm still driving the cab and there are nights that I don't get sleep because I'm driving the cab").

[5] A second rationale suggested by the ALJ in the sleep paragraph quoted above is that plaintiff, after the sleep study, was given treatment in the form of a CPAP machine. Although the ALJ did not discuss this issue in depth, there is evidence in the record suggesting that this device alleviated some of his problems. *See* R. 921 (Dr. Usman Khan: "wife says snoring resolved with CPAP"). Further such evidence is discussed below regarding Argument Three.

**II.     The ALJ Should Not Have Relied On The Second Medical Expert.**

Plaintiff argues that the ALJ improperly relied on the testimony of Dr. Cremerius. Plaintiff raises a grab bag of arguments. Before addressing them, the Court notes that the ALJ was not obligated to call Dr. Cremerius as a medical consultant. The ALJ already had before him the reports of two examining psychologists and a report from a DDS reviewing psychologist. So, even if the ALJ disregarded the testimony of Dr. Cremerius, the ALJ's decision would still be supported by substantial evidence. With this point in mind, the Court addresses plaintiff's specific criticisms.

First, plaintiff complains that Dr. Cremerius testified first, before plaintiff, meaning that his opinion was based only on the medical record. However, plaintiff concedes that there is no requirement that the ALJ call witnesses in a particular order, and the ALJ was fully aware that Dr. Cremerius had not heard plaintiff's testimony and was basing his opinion on the medical record (which contained some statements by plaintiff ). This is not an error.

Second, plaintiff argues that Dr. Cremerius "effectively based his entire opinion on [plaintiff's] incidental report to his doctor of driving a cab." Dkt. # 17 at 9.  But it is simply not true that Dr. Cremerius based his entire opinion on this fact. To the contrary, the reference to driving a cab was only a small part of his testimony and came after he thoroughly discussed numerous medical records, specifically (in order discussed) Exhibits 12F, 11F, 4F, 8F. 10F, 8F (second time), 4F (second time), 5F, 6F, and 13F. Moreover, although plaintiff complains that Dr. Cremerius relied on the "incidental" report, plaintiff does not argue that it was inconsistent with his testimony or with numerous other statements to the same effect made by plaintiff.

Third, plaintiff claims that Dr. Cremerius wrongfully believed that plaintiff was driving a cab 24 hours in a row rather than merely being "on call" for this period. In reading the transcript,

the Court cannot find support for this argument. Dr. Cremerius makes one reference to plaintiff's statement on Mother's Day 2011 that he was "working around the clock," but this statement is not inconsistent with the record. As a matter of common sense, it seems doubtful that Dr. Cremerius would have believed that plaintiff was consistently driving a cab for 24 straight hours.

Fourth, plaintiff claims that the ALJ should not have relied on Dr. Cremerius because he opined that plaintiff's PTSD was not a severe impairment, while the ALJ found that it was. This argument is basically another version of plaintiff's earlier argument regarding inconsistencies between steps two and four and fails for the same reasons.

Fifth, plaintiff finds it problematic that Dr. Cremerius was asked about one of plaintiff's depression medications (Divalproex), and was unfamiliar with this medication referred to by this name. But this brief exchange is not a basis for disregarding the testimony of Dr. Cremerius who, as the government points out, was not a psychiatrist. Moreover, as Dr. Cremerius stated, his opinion about side effects was based on a review of the symptoms plaintiff reported at the mental status exams. Finally, it bears repeating that the ALJ relied on other doctors whose opinions were consistent with those of Dr. Cremerius.

## III. New Evidence Submitted To The Appeals Council.

Shortly after the ALJ issued his opinion, plaintiff saw Dr. Mellin on a Friday, reporting that he felt depressed and was having suicidal thoughts. Dr. Mellin and plaintiff agreed that, after he spent the weekend with his two kids who were coming on a pre-scheduled visit, he would check into Hines V.A. hospital on Sunday night if he was still feeling depressed. Plaintiff did so, staying there from June 10th until June 13th, when he was discharged after reporting feeling better. On the day of his discharge, Dr. Mellin wrote a one-paragraph letter stating that plaintiff

was recently hospitalized because his depression "has been worse." R. 940. She concluded: "I feel at this time that due to the severity of both his depression and PTSD that he is unable to work and do not foresee him returning to work in the future." *Id.* Thereafter, plaintiff submitted to the Appeals Council the hospital records from this visit along with Dr. Mellin's letter. On July 16, 2013, the Appeal Council denied the request for review.

Under SSR § 404.970 and related Seventh Circuit case law, the Appeals Council must first review the proffered evidence and determine if it is new, material, and "relates to the period on or before the date of the [ALJ's] decision." If these conditions are met, then the Appeals Council considers whether the ALJ's decision is "contrary to the weight" of both the new and old evidence. *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997). Whether the Council made an error at this first step is reviewed *de novo*. *Id.* However, if the Appeals Council considers the evidence at the second step but then decides not to overturn the ALJ's decision, this decision is "discretionary and unreviewable" by this Court or the Seventh Circuit. *Id.*

In *Farrell v. Astrue*, 692 F.3d 767 (7th Cir. 2012), the Seventh Circuit noted that the rulings of the Appeals Council often include boilerplate language making it unclear which of these two decisional paths were followed. *Id.* at 771. "On the one hand, [the typical language] might indicate that the Appeals Council found the proffered new evidence to be immaterial, but on the other hand it might indicate that the Council accepted the evidence as material but found it insufficient to require a different result." *Id.* In light of this ambiguity, the Seventh Circuit held that it would interpret the ruling of the Appeals Council as relying on the first approach. *Id.* The Seventh Circuit then concluded that a doctor's diagnosis that plaintiff had fibromyalgia was new and material because the ALJ's decision unequivocally rested on a determination that such a

diagnosis had not been confirmed. The doctor's new diagnosis "fills in that evidentiary gap" and "builds on the allusions to possible fibromyalgia" in two earlier reports. *Id.*

Here, the parties argue over which standard applies. Not surprisingly, the government takes the position that the Appeals Council followed step two, which would mean that the decision is unreviewable now. The government acknowledges *Farrell* and further concedes that the language the Appeals Council used there is similar to the language used here. However, the government argues that there are other factors to distinguish this case. The government states that an agency manual, known as HALLEX, instructs the Appeals Council, if it is following step one, to include explicit language stating that one of the three conditions has not been met. Here, no such language was included. If the Council is following the step two approach, the HALLEX instructs the Council to include a separate exhibit list setting forth the new evidence and to state that this evidence did not meet the "weight of the evidence" standard. Here, there is such an exhibit list (R. 5) and the Council's ruling refers to the standard (R. 2). Plaintiff in his reply does not respond to the HALLEX arguments and instead re-asserts his claim that *Farrell* governs.

The Court thus has little information from which to determine which approach the Council relied on. As plaintiff states, the Council's ruling is opaque, with no analysis. The government's argument is not illogical, and at least one district court has accepted it. *See Yerk v. Colvin*, 2015 WL 1966722, * 23 (E.D. Wisc. May 1, 2015). However, the government never analyzes the new evidence and does not explain why it believes the evidence is new, material, and temporally relevant, on the one hand, but then is not enough to show that the ALJ's decision was contrary to the weight of the evidence, on the other hand.

In light of this uncertainty, the Court will proceed on the assumption that the Council rejected the new evidence as non-qualifying, a question reviewed *de novo*. Plaintiff argues that

the hospital records and letter from Dr. Mellin are new because they were "generated" after the ALJ's decision on May 30, 2012. This is true as plaintiff entered the hospital on June 10, 2012 and the letter is dated June 13th, both a few weeks after the decision. With one qualification regarding Dr. Mellin's letter, this Court agrees this evidence is new.

However, the Court finds that it is either not material or alternatively not temporally relevant. Plaintiff asserts that the new evidence is material because it "corroborates" his allegations about the laundry-list of symptoms. As the word corroboration suggests, this evidence "does not fill an evidentiary gap, but rather is more of the same type of evidence already before the ALJ." *Everett v. Colvin*, 2015 WL 3485602, *4 (N.D. Ind. June 2, 2015). Plaintiff does not discuss the specific details of this new evidence, but this Court, after reviewing these records, finds that the assessments contained therein are largely the same as those relied on by the ALJ. In this Court's view, these records do not suggest that plaintiff's condition had materially changed. On the Friday before he entered the hospital, Dr. Mellin rated his GAF as 56 to 58. R. 1050. This is not out of line with earlier GAF assessments, such as Dr. Renzi's assessment of a 60 GAF in September 2011 or even Dr. Mellin's assessment a year earlier of a GAF of 62 to 64. R. 902, 919. During and shortly after his hospital stay, plaintiff continued to attribute his sleep problems to his job.[6] During his hospital stay, a nurse was assigned to observe plaintiff while sleeping and noted no problems. *See* R. 992 ("slept without incidence"), R. 1005 ("slept without incidence"). The records also provide support for the claim that plaintiff's sleep problems were being addressed in part by the CPAP machine. R. 992 ("My wife brought my c-pap machine in today so I should get a good night [of] sleep tonight"). On June 13th, the day Dr. Mellin wrote her letter, she continued to give him the same diagnosis and rated his GAF as still

---

[6] *See* R. 979 ("He still struggles with insomnia, mainly due to his work schedule (drives a cab at night)"); R. 1049 ("He is still working nights so his sleep is disrupted.")

being between 56 and 58. R. 980. She continued him on one medication and transitioned him to another. In short, her observations are largely the same as those made the year before.

Plaintiff's other argument for why this evidence is material is that it supposedly fills an evidentiary gap by supporting his claim that he had been steadily deteriorating months before the ALJ issued his decision and that the hospital stay was the "culmination" of this process. The hospital records, however, point to a different timetable and cause. In statements to his healthcare providers, plaintiff repeatedly identified the trigger for the hospital visit as being his receipt of the ALJ's opinion and his realization that he might not get disability benefits. On the Friday visit with Dr. Mellin, plaintiff stated that he just received two days ago a letter from the ALJ denying his claim and that he "has been feeling more worthless since he got the letter." R. 1049. Plaintiff told the same story to others during his stay. *See* R. 1039 ("not being able to obtain disability money has exacerbated depression that *was previously well-treated* as an outpatient") (emphasis added). Plaintiff also repeatedly described the deterioration as having started in the last few weeks – *i.e.* after the issuance of the ALJ's decision.[7] In sum, to the extent this evidence is material, the Court finds that it does not relate to the period before the ALJ's ruling because any alleged deterioration occurred after the decision.

The same analysis applies to Dr. Mellin's letter. She had seen plaintiff periodically over the previous year or so before the ALJ's ruling, but had not submitted a letter that could be made available to the ALJ before he ruled. The fact that she only submitted the letter after the decision

---

[7] *See* R. 999 ("Pt reports that his SSDI claim was denied about two weeks ago, and he has been feeling increasingly down/depressed and overwhelmed *since that time*.") (emphasis added); R. 1002 (referring to stressors of "recently denied SSDI claim/appeal process, financial strain, and stressful work schedule"); R. 1008 ("two weeks ago, pt's ss disability application was denied, leading to increase in feelings of overwhelm"); R. 1043 ("For the past several weeks he has become more depressed, feels hopeless with little energy.")

suggests that her opinion is based on the recent hospital stay. This interpretation is further confirmed by her reference to plaintiff being disabled "at this time." As a result, her evidence does not relate to the period before the ALJ's decision. To the extent that her opinion was based on the earlier evidence, then it would not qualify as new evidence and the Council could have refused it on that ground. *See Perkins*, 107 F.3d at 1296.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is denied; the government's motion is granted, and the ALJ's decision is affirmed.

Date:  June 22, 2015            By:     _____
                                        Iain D. Johnston
                                        United States Magistrate Judge